## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TAISJA N. HARRELL, | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | No. 23-2366 |
| | : | |
| PEOPLESHARE, LLC, et al., | : | |
| Defendants. | : | **March 24, 2025** |

### <u>MEMORANDUM</u>

Plaintiff Taisja N. Harrell (a/k/a Nicole Harrell) brings racial discrimination claims against her former employer, PeopleShare LLC ("PeopleShare"), and her former supervisors Julie Kershner and Krysta Murray (collectively, "Defendants"). Ms. Harrell's Amended Complaint contains three counts. Count One—asserted against Defendant PeopleShare only—alleges race/color discrimination, retaliation, and hostile work environment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII").[1] Count Two—asserted against all Defendants—alleges race/color discrimination, retaliation, and hostile work environment in violation of 42 U.S.C. § 1981 ("§

---

[1] Am. Compl., ECF No. 26 ¶¶ 50-55

1981").[2]   Count Three—asserted against all Defendants—alleges race/color

discrimination, retaliation, and hostile work environment in violation of the

Pennsylvania Human Relations Act ("PHRA").[3]

Defendants move for summary judgment as to all claims.[4]   And

Defendants argue that, if Plaintiff's claims survive, damages should be limited

to backpay for the weeks during which Ms. Harrell was unemployed.[5]  For the

reasons that follow, the Court will deny Defendants' motion.

## I.   FACTUAL BACKGROUND[6]

Ms. Harrell is an African American, Indigenous, and Mexican

individual.[7]  In October 2022, Harrell was hired as a recruiter by PeopleShare,

a company that connects other companies with local job candidates.[8]  Harrell

was hired to the Strategic Talent Acquisition Recruiters ("STAR") Team,

which was directly supervised by Defendant Kershner and Defendant Murray.

---

[2] *Id.* ¶¶ 56-63.
[3] *Id.* ¶¶ 64-71.
[4] Defs.' Mot. Summ. J. (hereinafter Defs. MSJ), ECF No. 36.
[5] *Id.* at 2.
[6] Where uncontested by the other party and supported by the cited depositions, I accept Defendants' Statement of Undisputed Material Facts (ECF No. 36-4) and Plaintiff's Counter-Statement of Facts (ECF No. 41-2) as true for the purposes of this memorandum.
[7] Defs.' Undisputed Material Facts, ECF No. 36-4 ¶ 22.
[8] Pl.'s Counterstatement Material Facts, ECF No. 41-2 ¶ 9.

*Id.* ¶ 12.

On November 7, 2022, when Harrell began her employment as a STAR Team recruiter, three other employees—Kristin Gibson-Smith (African American), Alexandria Wixom (Caucasian), and Joshua Lutz (Caucasian)— also started their employment as STAR Team recruiters.  *Id.* ¶ 13.  The new recruiters went through a two-week onboarding process.  After onboarding, the recruiters entered a 20-week "ramp up period," when they were required to meet certain metrics while working at one of PeopleShare's branches.  *Id.* ¶ 16.

Defendants assigned the two African American recruiters—Harrell and Gibson-Smith—to PeopleShare's Green Tree Branch, which Plaintiff alleges to be a less desirable branch with a higher turnover rate.  By contrast, Defendants assigned the two Caucasian recruiters—Wixom and Lutz—to PeopleShare's West Chester Branch, which Plaintiff alleges to be more tailored towards training new recruiters.  *Id.* ¶ 20.

## A. <u>Branch Manager Randall Palakovich's Conduct</u>

While assigned to the Green Tree Branch, Harrell's day-to-day activities were supervised by Green Tree Branch Manager Randall Palakovich (Caucasian), who engaged in behavior that Harrell alleges to be racially discriminatory and hostile.

For instance, during a morning meeting in November 2022, Harrell alleges that Palakovich shared a video of an African American man singing about Thanksgiving food and singled out Harrell for not laughing at the video. *Id.* ¶¶ 24-25.  During another morning meeting, Harrell alleges that Palakovich shared a video of comedian Katt Williams using the racial slur "n*gger" several times and making sexually inappropriate gestures.  Harrell alleges that Palakovich singled out Harrell and Gibson-Smith for not laughing at the video, instructing the two African American employees to "lighten up." *Id.* ¶¶ 26-27.

On another occasion, Harrell alleges that Palakovich told the team that he would not contact job candidates with "difficult names" like "Jaqueesha," which Harrell understood to refer to traditionally African American names. Taisja Harrell Dep. Tr. 79:13-22, ECF No. 41-4; Pl.'s Counterstatement Material Facts, ECF No. 41-2 ¶ 29.  In response, another recruiter, Hannah Walker, allegedly stated that—like Palakovich—she would not call a candidate if their name was hard to pronounce. [9]  *Id.* ¶ 31.

---

[9] Defendants argue that Plaintiff cannot rely on statements by Walker because they are inadmissible hearsay.  *See* Defs.' Reply, ECF No. 42, at 18-21.  However, Defendants erroneously characterize Walker's statements as hearsay.  Under the Federal Rules of Evidence, a statement is "not hearsay" if it is "offered against an opposing party" and "was made by the party's agent or employee on a matter within the scope of that relationship while it existed . . . ." FED. R. EVID. 801(D)(2)(d). Walker was Defendant PeopleShare's employee, and her statements concerned her

Harrell also alleges that Palakovich used racially loaded language to describe African American people but not Caucasian people. For instance, Harrell alleges that Palakovich once described an African American woman as "ratchet" when she called in yelling about an issue. By contrast, Harrell alleges that Palakovich described a Caucasian woman as "irate" when she called in yelling about an issue. *Id.* ¶ 32. Harrell alleges that Walker—again following Palakovich's lead—similarly used racially loaded language and referred to the African American caller as "ghetto." *Id.* ¶ 32.

Harrell alleges that Palakovich's racially hostile behavior also extended towards other non-Caucasian races. For example, Palakovich once described going to the nail salon and questioned how someone could understand what Asian women say because "all they do is make noise." *Id.* ¶ 28.

Harrell complained about Palakovich's behavior to lead recruiter Amanda Walls (Caucasian), whom Harrell was shadowing during the ramp up period.[10] In response to the complaint, Walls informed Harrell that Palakovich had previously been reprimanded for discrimination and inappropriate

---

work with PeopleShare. Thus, Walker's statements are not hearsay—much less inadmissible hearsay—and Defendants' argument fails.

[10] *See id.* ¶ 34; Taisja Harrell Dep. Tr. 83:19-23, ECF No. 41-4.

content.[11]  Pl.'s Counterstatement Material Facts, ECF No. 41-2 ¶ 35.  Walls explained that she previously made complaints about Palakovich's inappropriate behavior and her belief that Palakovich's team was stealing her commissions.[12]  When Walls complained, she was moved away from Palakovich's branch.

### B. **Krysta Murray and Julie Kershner's Conduct**

In a one-on-one meeting with Defendant Murray, Harrell—like Walls— complained that Palakovich's team was stealing her commissions.  Harrell alleges that Defendant Murray dismissed the complaint, claiming that it was "not her problem" and "there was nothing she could do about it."[13]  Harrell then elevated her complaint to Defendant Kershner.  *Id.* ¶ 43.  However, unlike Walls, Harrell was not moved away from Palakovich's branch in response to her complaints.  *See id.* ¶¶ 37-38.[14]

---

[11] Defendants argue that Plaintiff cannot rely on statements by Walls because they are inadmissible hearsay.  *See* Defs.' Reply, ECF No. 42, at 18-21.  However, Walls was Defendant PeopleShare's employee, and her statements concerned her work with PeopleShare.  Thus, these statements are not hearsay and Defendant's argument is rejected.  *See supra* note 9.

[12] *See id.* ¶ 36; Taisja Harrell Dep. Tr. 96:9-22, ECF No. 41-4.

[13] Pl.'s Counterstatement Material Facts, ECF No. 41-2 ¶ 42.

[14] During her conversations with Defendants Murray and Kershner, Harrell did not complain about any racially discriminatory behavior by Palakovich.  *See* Taisja Harrell Dep. Tr. 86:9-19, ECF No. 41-4.

In addition to this differential treatment, Harrell alleges that Defendant Kershner and Defendant Murray generally treated Harrell with hostility that they did not exhibit towards Caucasian employees.[15]  Harrell asserts that, when she asked Kershner or Murray for help, she was met with aggression and a condescending tone that caused her to not feel comfortable speaking with either individual Defendant. *Id.* ¶ 47.  Gibson-Smith allegedly told Harrell that she too found Defendant Murray to be condescending towards her. *Id.* ¶ 49. Meanwhile, Harrell alleges that Defendant Kershner and Defendant Murray did not exhibit hostility towards the Caucasian recruiters.  For instance, Harrell alleges that Defendant Kershner and Defendant Murray publicly praised Wixom for a work achievement but declined to give similar recognition to Harrell or Gibson-Smith for the same achievement. *Id.* ¶¶ 44-45.

Like Palakovich, Defendant Kershner's racially discriminatory behavior allegedly extended towards other non-Caucasian races.  For example, during a STAR Team meeting in December 2022, Defendant Kershner instructed recruiter Millie Vargo (Hispanic) to sing the song Feliz Navidad. *Id.* ¶ 67. While Vargo was singing, Defendant Kershner interrupted and directed Vargo

---

[15] Pl.'s Counterstatement Material Facts, ECF No. 41-2 ¶ 46.

to sing it "with an accent."  *Id.* ¶ 68.  Defendants later terminated Vargo for allegedly failing to meet her metrics.  *Id.* ¶ 68.

In or about March 2023, Harrell was assigned to PeopleShare's Statesville Branch, where—in response to comments that Harrell had an attitude—Defendant Kershner told Harrell that she had a "resting bitch face" and she "needed to put a fucking smile" on her face.  Taisja Harrell Dep. Tr. 91:20-24, ECF No. 41-4.  When Harrell appeared upset, Defendant Kershner allegedly said "are you about to cry . . . because I'll come across the camera and smack you across the face."  *Id.* at 92:1-7.

After the incident, Harrell alleges that Defendant Kershner began monitoring Harrell closely and criticizing her for minor issues while not treating the Caucasian recruiters similarly.[16]  Then, Defendant Kershner announced that she would have another recruiter—Wesley Deedan (African American)—speak with Harrell because he was also a "problem child" and Harrell would be able relate to him because they were similar and "from the same place," which Harrell understood to refer to their race.  *Id.* ¶ 60.

When Deedan spoke with Harrell, Deedan said, "as a black person to

---

[16] Pl.'s Counterstatement Material Facts, ECF No. 41-2 ¶ 61.

another black person, I can see why you don't want to smile." *Id.* ¶ 63.  Harrell reported to Deedan that she felt Defendants were discriminating against her, and she specifically discussed the inappropriate videos that Palakovich had shared with their team.  *Id.* ¶¶ 64-65.  Deedan subsequently reported to Defendant Kershner and/or Defendant Murray that Harrell thought the work environment was unprofessional because of Palakovich's behavior.  *Id.* ¶ 66.

## C. <u>Harrell's Termination</u>

Defendants terminated Harrell on March 17, 2023—just two days after Harrell complained about racial discrimination to Deedan.[17]  Defendant Murray informed Harrell in a message via Microsoft Teams that Harrell was being terminated because she "had not met [her] metrics goals at any point during the time of [her] employment" and due to her performance.[18]  That same day, Defendants also terminated Gibson-Smith for allegedly not meeting her metrics.  *Id.* ¶ 84.

Defendants allege that Harrell was never "on track to meet her metrics" during her time with PeopleShare.[19]  Harrell disagrees, alleging that she did

---

[17] Am. Compl., ECF No. 26 ¶ 53.
[18] Pl.'s Counterstatement Material Facts, ECF No. 41-2 ¶ 79.
[19] Defs.' Undisputed Material Facts, ECF No. 36-4 ¶ 338.

meet some of her metric goals and, on some metrics, she was outperforming her colleagues.[20]

None of the STAR Team recruiters who began working with PeopleShare alongside Harrell on November 7, 2022, met all their metrics in January or February of 2023.[21]  Nonetheless, in March 2023, Defendants terminated the two African American recruiters—Harrell and Gibson-Smith—and continued employing the two Caucasian recruiters—Wixom and Lutz.[22]

Additionally, while Harrell was working at the Statesville Branch, Defendants terminated the only other African American employee at the branch: Kaylin Thomas.  *Id.* ¶ 51.  Harrell was told by the Branch Manager that Defendants terminated Thomas because of Thomas' "attitude,"[23] but Defendants allege they terminated Thomas for poor performance.[24]

On the day of Harrell's termination, Defendant Murray allegedly expressed concerns to Defendant Kershner about Harrell not being able to meet her metrics,[25] and Defendant Kershner allegedly discussed terminating Harrell

---

[20] Pl.'s Resp. in Opp'n to Defs.' MSJ, ECF No. 41, at 20-21.
[21] Pl.'s Counterstatement Material Facts, ECF No. 41-2 ¶¶ 90-93, 94-98.
[22] *Id.* ¶ 98; Pl.'s Resp. to Defs.' Undisputed Material Facts, ECF No. 41-1 ¶ 91.
[23] Taisja Harrell Dep. Tr. 109:19-24, 110:1-5, ECF No. 41-4.
[24] Defs.' Undisputed Material Facts, ECF No. 36-4 ¶ 555.
[25] Pl.'s Counterstatement Material Facts, ECF No. 41-2 ¶ 71.

with Tiffany Scott (Caucasian), PeopleShare's Chief Operating Officer and Kershner's direct supervisor.[26]  Defendant Murray, Defendant Kershner, and Scott disagree on who made the decision to terminate Harrell.[27]

## II.    PROCEDURAL BACKGROUND

Following her termination, Harrell filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and Pennsylvania Human Relations Commission ("PHRC"), in which she specifically referenced Defendant Murray and Defendant Kershner. *Id.* ¶ 107.  Harrell then filed suit in this Court, where Defendants now move for summary judgment.

## III.    LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine"

---

[26] *Id.* ¶ 72.

[27] Defendant Murray alleges that the decision to terminate Harrell was made by Kershner and Scott.  *Id.* ¶ 75.  Defendant Kershner alleges that the decision to terminate Harrell was made by Kershner, Scott, and Murray, but that Scott was the final decisionmaker.  *Id.*  And Scott alleges that she authorized the termination but that, from late 2022 to early 2023, all decisions related to termination of employees on the STAR Team were made by Kershner.  *Id.* ¶ 76.

if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party has met its initial burden, the nonmoving party must then "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. Both parties must support their factual positions by: "(A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1). The materials in the record that parties may rely on include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). In opposing a motion for summary judgment, the nonmoving party may not "rely merely upon bare assertions, conclusory allegations or suspicions." *Fireman's Ins. Co. of Newark, N.J. v. DuFresne*, 676 F.2d 965,

969 (3d Cir. 1982).

In essence, the inquiry at summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). In considering this inquiry, "a court does not resolve factual disputes or make credibility determinations, and must view facts and inferences in the light most favorable to the party opposing the motion." *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995). "This standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." *Stewart v. Rutgers, State Univ.*, 120 F.3d 426, 431 (3d Cir. 1997) (quoting *Robinson v. PPG Indus. Inc.,* 23 F.3d 1159, 1162 (7th Cir. 1994)).

## IV.  ANALYSIS

### A. Claims Against PeopleShare

Harrell brings claims against Defendant PeopleShare for race/color discrimination, retaliation, and hostile work environment in violation of Title VII. *See* Am. Compl., ECF No. 26 ¶¶ 50-65 (Count I). Harrell also brings mirroring claims against PeopleShare for race/color discrimination, retaliation, and hostile work environment under § 1981 and the PHRA. *See id.* ¶¶ 56-63

(Count II), 64-71 (Count III). The elements of Harrell's claims against PeopleShare are identical under all three mechanisms,[28] so the Court analyzes them together. For the reasons below, the Court will deny summary judgment as to each of Harrell's claims against PeopleShare.

### a. Race/Color Discrimination Claims

Harrell claims that Defendant PeopleShare discriminated against her and ultimately terminated her because of her race.

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e–2(a)(1). "The parties do not dispute that [Harrell's] disparate treatment race discrimination claims under Title VII, section 1981, and the PHRA require application of the familiar burden-shifting framework the Supreme Court articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973)."

---

[28] *See Brown v. J. Kaz, Inc.,* 581 F.3d 175, 181 (3d Cir. 2009) ("[S]ubstantive elements of a claim under section 1981 are generally identical to the elements of an employment discrimination claim under Title VII."); *Gomez v. Allegheny Health Servs., Inc.,* 71 F. 3d 1079, 1083-84 (3d Cir. 1995) ("Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act, prohibit discrimination in employment based on race or national origin. The state Act is construed consistently with interpretations of Title VII.").

*Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999).

Under the burden-shifting framework, Harrell "must first establish a prima facie case of discrimination by showing that: (1) [s]he is a member of a protected class; (2) [s]he was qualified for the position [s]he sought to attain or retain; (3) [s]he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008).[29]  If Harrell establishes a prima facie case, "an inference of discriminatory motive arises and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Makky*, 541 F.3d at 214.    If the defendant succeeds in articulating a legitimate and nondiscriminatory reason, "the inference of discrimination drops and the burden shifts back to [Harrell] to show that the defendant's proffered reason is merely pretext for intentional discrimination." *Id.*

For the reasons set forth below, Harrell has established her prima facie

---

[29] "Courts vary the precise components required for a prima facie case because 'the elements . . . depend on the facts of the particular case.'" *Young v. St. James Management, LLC*, 749 F.Supp.2d 281, 288 (E.D. Pa. 2010) (quoting *Jones*, 198 F.3d at 411)).  "The burden to establish a prima facie case is a not an onerous one, but a prima facie case can allow a court 'to eliminate the most obvious, lawful reasons for the defendant's action.'" *Id.* (quoting *Pivirotto v. Innovative Sys.*, 191 F.3d 344, 352 (3d Cir.1999)).

case and shown circumstances from which a reasonable jury could infer that Defendants' proffered reason for terminating Harrell was pretext, satisfying the *McDonnell Douglas* test and precluding summary judgment on Harrell's race/color discrimination claims against PeopleShare.

Harrell must fulfill the initial step of the *McDonnell Douglas* analysis by establishing a prima facie case of race discrimination. The third element of the prima facie case—that Harrell suffered an adverse employment action when Defendants terminated her—is not in dispute. But the remaining three elements—that Harrell is a member of a protected class; that Harrell was qualified for the position she sought to retain; and that Harrell's termination occurred under circumstances that could give rise to an inference of intentional discrimination—are disputed.

As to the first element, Harrell is African American, Indigenous, and Mexican, and race is a protected class under Title VII.[30] PeopleShare argues that Harrell cannot point to evidence demonstrating that any supervisor/decisionmaker was aware of Harrell's race during her employment, but this argument is unavailing. PeopleShare cites *Geraci v. Moody-Tottrup,*

---

[30] *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973) (recognizing race as a protected class).

*International, Inc.*, a pregnancy discrimination case in which the defendant

employer "did not know that the plaintiff even belonged to the protected class."

82 F.3d 578, 581 (3d Cir. 1996). But *Geraci* distinguishes its facts from the

facts "in the vast majority of discrimination cases" where "the plaintiff's

membership [in a protected class] is . . . patent," such as in "race or gender"

cases. *Id.* This is a race discrimination case, and Harrell is an African

American, Indigenous, and Mexican individual with skin that is visibly

dark/brown.[31] Thus, Harrell's membership in a protected class is patent, and

she has satisfied this element.[32]

As to the next element, Harrell asserts she was qualified for the STAR

Team recruiter position based on her previous experience as a junior recruiter

at Citizens Bank, a recruiting coordinator for MedX Corporation, and a Human

---

[31] *See* Pl.'s Counterstatement Material Facts, ECF No. 41-2 ¶¶ 1-2; Krysta Murray
Dep. Tr. 40:17-25, ECF No. 41-5 (agreeing that Harrell has "darker skin"); Randall
Palakovich Dep. Tr. 34:3-6, ECF No. 41-6 (stating that Harrell's skin is "brown");
Wesley Deedan Dep. Tr. 31:13-19, ECF No. 41-9 (indicating that Harrell's race is
visible based off her physical characteristics, stating "I assume [Harrell is] black . .
. . I'm black, and I assume she's black.").

[32] PeopleShare also cites *Boykins v. SEPTA*, a non-precedential race discrimination
case in which a plaintiff sued after being *denied an interview* and the individuals
participating in the interview selection process had not met the plaintiff and did not
know his race when denying him the interview. 722 Fed. Appx. 148, 156 n.8 (3d
Cir. 2018). Like *Geraci*, *Boykins* is clearly distinguishable from the facts at issue
here. Unlike the plaintiff in *Boykins*, Harrell had many interactions with the
Defendants in which her race would have been apparent.

Resources faculty recruiter at Community College of Philadelphia.[33]  Viewing facts and inferences in the light most favorable to Harrell, these experiences equipped Harrell to succeed in similar tasks as a recruiter at PeopleShare and qualified her for the position.

PeopleShare argues that Harrell was unqualified for her position because she failed to meet her metrics, but two of the other STAR Team recruiters—Wixom and Lutz—also failed to meet their metrics and were nonetheless retained.  *See id.* at 22.  PeopleShare's argument is further undercut by the fact that Defendants terminated Harrell during her training period, as opposed to after she completed her training.  *See id.* at 10.  Thus, a reasonable jury could conclude that Harrell was qualified for the position she sought to retain.

As to the final element, Harrell argues that Defendants treated similarly situated Caucasian recruiters more favorably, giving rise to an inference of discrimination.  "In order to determine who might qualify as a similarly situated employee we must look to the job function, level of supervisory responsibility and salary, as well as other factors relevant to the particular workplace."  *Monaco v. Am. Gen. Assurance Co.*, 359 F.3d 296, 305 (3d Cir.

---

[33] Pl.'s Resp. in Opp'n to Defs.' MSJ, ECF No. 41, at 15-16.

2004).  Determining whether employees are similarly situated "requires a court to undertake a fact-intensive inquiry on a case-by-case basis rather than in a mechanistic and inflexible manner," *id.*, and "'[a]s a general rule, whether individuals are similarly situated is a factual question for the jury,'" *Hampshire v. Bard*, 793 Fed. Appx. 75, 80 (3d Cir. 2019) (quoting *McDonald v. Village of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004)).  Still, "a court may nonetheless grant summary judgment if no reasonable jury could find that the individuals identified by the plaintiffs were similarly situated." *Id.*

Here, a reasonable jury could find that Gibson-Smith, Wixom, and Lutz were similarly situated to Harrell.  Gibson-Smith, Wixom, and Lutz began their employment on November 7, 2022, like Harrell; were employed as STAR Team recruiters like Harrell; had similar salaries to Harrell;[34] were supervised by Defendant Kershner and Defendant Murray like Harrell; and underwent PeopleShare's onboarding and ramp up processes like Harrell.  Thus, Gibson-Smith, Wixom, and Lutz were similarly situated to Harrell.

A reasonable jury could also conclude that Defendants treated the

---

[34] *See* Defs.' MSJ, Ex. AS, ECF No. 36-49 (listing Harrell's base salary as $52,000; Wixom's base salary as $55,000; Lutz's base salary as $48,000; and Gibson-Smith's base salary as $42,000).

similarly situated Caucasian employees—Wixom and Lutz—more favorably than Harrell, giving rise to an inference of discrimination. Defendants assigned Harrell and the other African American recruiter, Gibson-Smith, to a branch with a higher turnover rate, and Defendants assigned the two Caucasian recruiters, Wixom and Lutz, to a branch that was more tailored towards training new recruiters.[35] Then, Defendants terminated Harrell and Gibson-Smith (both African American) for failing to meet their metrics, but Defendants continued to employ Wixom and Lutz (both Caucasian) even though they similarly failed to meet their metrics. *Id.* at 22. Although PeopleShare alleges that Wixom and Lutz's overall averages were higher than Harrell's overall averages, Harrell points to evidence from which a reasonable jury could conclude that— from January 2023 until her termination in March 2023—Harrell was outperforming or performing just as well as her Caucasian comparators. *Id.* at 21. Viewing facts and inferences in the light most favorable to Harrell, these circumstances are sufficient to give rise to an inference of intentional discrimination.

Harrell has established her prima facie case of discrimination, so the

---

[35] *See* Pl.'s Resp. in Opp'n to Defs.' MSJ, ECF No. 41, at 20.

burden shifts to PeopleShare to provide a "legitimate, nondiscriminatory reason" for Harrell's termination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). PeopleShare asserts that Harrell was fired for her continued failure to meet her metrics and/or show signs of improvement,[36] satisfying step two of the analysis.

At step three of the analysis, the burden returns to Harrell to show that PeopleShare's "stated reason for [the adverse employment action] was in fact pretext." *McDonnell Douglas*, 411 U.S. at 804. "[T]o defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).[37] The Third Circuit has found that

---

[36] *See* Defs.' MSJ, ECF No. 36-3, at 25-26.

[37] "To discredit the employer's articulated reason, the plaintiff need not produce evidence that necessarily leads to the conclusion that the employer acted for discriminatory reasons nor produce additional evidence beyond her prima facie case. The plaintiff must, however, point to weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons [such] that a reasonable factfinder could rationally find them unworthy of credence

"factors such as the defendant's credibility, the timing of an employee's dismissal, and the employer's treatment of the employee could raise an inference of pretext which would make summary judgment for the employer inappropriate." *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 638-39 (3d Cir. 1993).

Together, the timing of Harrell's dismissal and Defendants' treatment of Harrell raise an inference that PeopleShare's purported reasons for terminating Harrell were pretextual. "To consider timing and/or employee treatment in relation to a dismissal as evidence of discrimination, there must be some logical connection between the timing or treatment and the possibility of the particular discrimination at issue." *Walton v. Mental Health Ass'n. of Southeastern Pennsylvania*, 168 F.3d 661, 669 (3d Cir. 1999).

There is a logical connection here. Defendants terminated Harrell just two days after Harrell reported to Deedan that she felt Defendants were racially discriminating against her and that she believed Palakovich's racist behavior created an inappropriate work environment.[38]    And in that conversation,

_____

and hence infer that the proffered nondiscriminatory reason did not actually motivate the employer's action." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 644 (3d Cir. 1998) (internal citations and quotation marks omitted).
[38] *See* Am. Compl., ECF No. 26 ¶ 53.

Deedan's statements affirmed that Harrell's complaints were tied to her race. *See* Pl.'s Counterstatement Material Facts, ECF No. 41-2 ¶ 63 ("[A]s a black person to another black person, I can see why you don't want to smile."). Thus, there is a rational connection between the timing and the possibility of race discrimination. *Contra Walton*, 168 F.3d at 669-70 (finding that "nothing connect[ed] the timing of the dismissal or the related circumstances with a discriminatory motive").

This "timing . . . together with facts" that a reasonable jury could find to have "indicated racial prejudice" (i.e., the allegedly racially hostile behavior from Harrell's supervisors and PeopleShare's decision to simultaneously terminate two African American recruiters but retain two similarly situated Caucasian recruiters) is "sufficient to create an issue of fact as to whether the action was racially motivated." *Id.* at 669. In other words, "a factfinder could credit [Harrell's] testimony regarding the harshness of treatment [s]he received," as well as the timing of Harrell's discharge, "and conclude the company's proffered reasons for firing [Harrell] were pretextual." *Josey*, 996 F.2d at 639 (discussing *Weldon v. Kraft, Inc.*, 896 F.2d 793, 799-800 (3d Cir. 1990)). Thus, Harrell has raised genuine issues of material fact and "summary judgment for the employer [is] inappropriate." *Id.* The Court therefore denies

summary judgment as to Harrell's race/color discrimination claims against PeopleShare.

### b. Retaliation Claims

Harrell also claims that Defendant PeopleShare terminated her in retaliation for her opposition to unlawful employment practices.

Title VII makes it unlawful "for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e–3. Like Harrell's race/color discrimination claims, Harrell's retaliation claims proceed under the three-step, burden-shifting framework set out in *McDonnell Douglas*. *See Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007).

Under the burden-shifting framework, Harrell must first establish a prima facie case of retaliation by showing: (1) she engaged in a "protected employee activity;" (2) she suffered an "adverse action by the employer either after or contemporaneous with the employee's protected activity;" and (3) a "causal connection" exists "between the employee's protected activity and the employer's adverse action." *Id.* If Harrell establishes a prima facie case, the

burden shifts to the defendant to "articulate some legitimate, non-retaliatory reason for the adverse employment action." *Id.* If the defendant succeeds in articulating a legitimate and non-retaliatory reason, the burden shifts back to Harrell to show "that 'the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'" *Id.* (quoting *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006)).

For the reasons set forth below, Harrell has established her prima facie case and satisfied the *McDonnell Douglas* test, precluding summary judgment on Harrell's retaliation claims against PeopleShare.

Harrell must fulfill the initial step of the *McDonnell Douglas* analysis by establishing a prima facie case of retaliation. The second element of the prima facie case—that Harrell suffered adverse action either after or contemporaneous with her protected activity—is not in dispute. But the remaining two elements—that Harrell engaged in protected activity and that there was a causal connection between Harrell's protected activity and the employer's adverse action—are disputed.

Harrell alleges that she engaged in protected activity when she made complaints about Palakovich's racist behavior. As a preliminary matter, Harrell "must show that [s]he held 'an objectively reasonable belief, in good

faith, that the activity [s]he opposed is unlawful under Title VII.'" *Kengerski v. Harper*, 6 F.4th 531, 536 (3d Cir. 2021) (quoting *Moore*, 461 F.3d at 341). The question is: "Could a reasonable person, standing in [Harrell's] shoes, have believed that [Palakovich's] behavior violated Title VII?" *Id.*[39] Viewing facts and inferences in the light most favorable to Harrell, the answer is yes. Among other things, Palakovich encouraged his team not to contact job candidates with names like "Jaqueesha;" used racially loaded language like "ratchet" to describe African American people but not Caucasian people; and shared inappropriate videos during work meetings (including a video that repeatedly used a racial slur) and then singled out Harrell and another African American employee for not laughing. It was reasonable to believe that this activity was unlawful under Title VII.

Harrell must also show that her opposition to this activity constituted "protected employee activity." *Marra*, 497 F.3d at 300. "[T]here is no hard and fast rule as to whether the conduct in a given case is protected." *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir.

---

[39] Note that, unlike for a hostile work environment claim, "for a retaliation claim a plaintiff need not show that [her] working environment in hindsight was actually hostile, only that [s]he held an objectively reasonable belief that it was." *Id.* at 537.

2006).   The Third Circuit has recognized that Title VII's anti-retaliation

provision is broad enough to protect "informal protests of discriminatory

employment practices, including making complaints to management, writing

critical letters to customers, protesting against discrimination by industry or

society in general, and expressing support for co-workers who have filed

formal charges." *Id.* (quoting *Sumner v. U.S. Postal Service*, 899 F.2d 203,

209 (2d Cir. 1990)).   But "opposition to an illegal employment practice must

identify the employer and the practice—if not specifically, at least by context,"

because "[a] general complaint of unfair treatment is insufficient to establish

protected activity under Title VII."   *Id.*   Ultimately, "it must be possible to

discern from the context of the statement that the employee opposes an

unlawful employment practice."   *Id.*

PeopleShare argues that Harrell did not engage in protected activity

because, although Harrell complained to Defendant Kershner and Defendant

Murray about "unfair treatment" from Palakovich, Harrell did not specifically

discuss race or national origin during these complaints.[40]   Harrell's complaints

to Kershner and Murray concerned Palakovich's stealing of commissions, not

---

[40] *See* Defs.' MSJ, ECF No. 36-3, at 32.

his racist behavior.[41]   But Harrell also made complaints to other individuals

that more clearly targeted Palakovich's racially discriminatory behavior.   *See*

Pl.'s Resp. in Opp'n to Defs.' MSJ, ECF No. 41, at 24-25 (describing Harrell's

reports to Deedan, Walls, and Gibson-Smith).   For instance, in her complaint

to Deedan, Harrell identified Palakovich and specifically complained about the

racially inappropriate videos that Harrell shared.   And during this conversation,

Deedan explicitly acknowledged the connection to Harrell's race, stating that

"as a black person" he understood why Harrell didn't want to smile while

working at PeopleShare.[42]   From the context of these statements, a reasonable

jury could discern that Harrell's complaint to Deedan was opposing unlawful

activity under Title VII—if not explicitly then at the very least implicitly,

because the context of Harrell's complaint and Deedan's response indicates

that race was at the heart of the activity that Harrell was opposing.   *Contra*

*Curay-Cramer*, 450 F.3d at 135 (describing a letter that was "too vague to

constitute opposition to an unlawful employment practice . . . because it neither

'explicitly or implicitly' alleged that a protected characteristic was the basis

for the adverse employment action").   Thus, a reasonable jury could conclude

---

[41] *See* Taisja Harrell Dep. Tr. 86:9-19, ECF No. 41-4.
[42] Pl.'s Counterstatement Material Facts, ECF No. 41-2 ¶ 63.

that Harrell engaged in protected activity, satisfying the first element of her prima facie case.

The other element of Harrell's prima facie case of retaliation is a causal connection between Harrell's protected activity and the employer's adverse action. "[A] plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). To establish this causal link, "a plaintiff may rely on a broad array of evidence . . . ." *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007) (internal quotation marks omitted). "In certain narrow circumstances, an 'unusually suggestive' proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection." *Id.* (citing *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (holding that the discharge of a plaintiff two days after filing an EEOC complaint was sufficient, on its own, to establish causation)).[43]

---

[43] "It is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn." *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 178 (3d. Cir. 1997).

Harrell was discharged two days after she complained to Deedan about unlawful activity.[44]  Like in *Jalil v. Avdel Corporation*, 873 F.2d 701, 708 (3d Cir. 1989), this unusually suggestive proximity in time is sufficient, on its own, to establish causation and satisfy Harrell's prima facie case for purposes of summary judgment.[45]

PeopleShare argues this temporal proximity cannot establish causation because PeopleShare asserts that Deedan did not tell Defendant Murray and/or Defendant Kershner about the contents of his conversation with Harrell until after Harrell's termination.  However, Deedan's cited deposition fails to support this assertion.[46]  Rather, Deedan's deposition indicates that Deedan

---

[44] *See* Am. Compl., ECF No. 26 ¶ 53.

[45] Harrell also asserts circumstantial evidence of a "pattern of antagonism" following the protected conduct that goes toward causation.  *See* Pl.'s Resp. in Opp'n to Defs.' MSJ, ECF No. 41, at 28-30.  However, the Court need not evaluate this evidence at this stage, given that the two-day proximity is sufficient on its own to satisfy Harrell's prima facie case for the purpose of summary judgment.  *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 n.5 (3d Cir. 2000) (recognizing that "the relative evidentiary impact of temporal evidence may vary depending upon the stage of the *McDonnell Douglas* proof analysis, and the procedural circumstance," and noting that "[t]here is clearly a difference between two days and nineteen months," and "[t]here is also a difference between a plaintiff relying upon temporal proximity to satisfy her prima facie case for the purpose of summary judgment and to reverse a verdict") (internal citations omitted).

[46] *See* FED. R. CIV. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by (A) citing to particular parts of materials in the record . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute . . . .").

does not remember when he reported Harrell's complaint and only knows for sure that he reported it after his *conversation* with Harrell (not necessarily after Harrell's *termination*).  *See* Wesley Deedan Dep. Tr. 41:7-18, ECF No. 36-15. Thus, viewing facts and inferences in the light most favorable to Harrell, PeopleShare's argument fails to rebut the causal link established by the unusually suggestive proximity in time between Harrell's protected activity and her termination.  When Deedan reported to Defendant Murray and/or Defendant Kershner is an issue of fact that the factfinder may consider at trial.

Harrell has established her prima facie case of retaliation.  Steps two and three of the *McDonnell Douglas* analysis for these claims are identical to steps two and three of the *McDonnell Douglas* analysis for Harrell's discrimination claims discussed *supra*.  Thus, Harrell has raised genuine issues of material fact and the Court therefore denies summary judgment as to Harrell's retaliation claims against PeopleShare.

### c.  Hostile Work Environment Claims

Harrell also claims that Defendant PeopleShare subjected her to a hostile work environment.

A hostile work environment claim exists under Title VII when harassment is "sufficiently severe or pervasive 'to alter the conditions of the

victim's employment and create an abusive working environment.'" *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). To establish a hostile work environment claim, Harrell must prove: (1) she suffered intentional discrimination because of her race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person of the same race; and (5) there is a basis for employer liability. *See Andreoli v. Gates*, 482 F.3d 641, 643 (3d Cir. 2007). "[T]he record must be evaluated as a whole to decide whether [Harrell] has proved [her hostile work environment] case, because 'particularly in the discrimination area, it is often difficult to determine the motivations of an action . . . .'" *Cardenas v. Massey*, 269 F.3d 251, 260-01 (3d Cir. 2001).

PeopleShare only disputes the first two prongs—that Harrell suffered intentional discrimination because of her race and that the discrimination was severe or pervasive. For the reasons set forth below, Harrell has demonstrated genuine issues of material fact as to these elements, precluding summary judgment as to Harrell's hostile work environment claims against PeopleShare.

The hostile work environment standard "takes a middle path between making actionable any conduct that is merely offensive and requiring the

conduct to cause a tangible psychological injury." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).  Conduct must be severe or pervasive enough to create a work environment that is both objectively and subjectively hostile.[47] In analyzing hostility, "a court must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Nitkin v. Main Line Health*, 67 F.4th 565, 570 (3d Cir. 2023) (discussing sexually hostile work environment claims).[48]

The frequency of the discriminatory conduct weighs in favor of Harrell. Harrell's allegations—which include at least five racially hostile comments by Palakovich and two racially hostile comments by Kershner—took place over

---

[47] *Id.* at 21-22 ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.").

[48] Note that the Supreme Court has recognized that, while "there is good sense in seeking generally to harmonize the standards of what amounts to actionable harassment" in racial and sexual hostile work environment cases, "racial and sexual harassment will often take different forms, and standards may not be entirely interchangeable . . . ." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 n.1 (1998).

four months.[49]  Based on these statements alone, the frequency of alleged

discriminatory conduct reflects 1.75 discriminatory statements per month,

reflecting a rate of 10.5 discriminatory statements per six-month period.

*Contra Nitkin*, 67 F.4th at 571 (finding that, when discriminatory conduct was

"spread out over a span of over three-and-a-half years," the "relative

infrequency" of "one or two statements in a given six-month period" indicates

that the actions were not severe or pervasive harassment).  This relatively

frequent discriminatory conduct indicates pervasive harassment.

The nature and severity of the misconduct is less clear cut, but the record,

taken as a whole, weighs in favor of Harrell.  While "infrequent offensive

utterances are not severe or pervasive," the Third Circuit "permit[s] hostile

work environment claims based on more persistent and serious harassment to

proceed to trial."  *Id.* at 572.  Harrell sets forth facts indicating sufficiently

serious harassment which, viewed in totality, indicates severity.

Harrell alleges a specific instance in which Defendant Kershner's

conduct explicitly crossed the line from being a "mere offensive utterance" to

being "physically threatening," indicating severity.  *Harris v. Forklift Systems,*

---

[49] Harrell's allegations occur from November 7, 2022, to March 17, 2023.

*Inc.*, 510 U.S. 17, 23 (1993).  Kershner threatened to "come across the camera and smack [Harrell] across the face," when Harrell appeared upset because of treatment she viewed to be discriminatory.[50]  This physical threat reflects serious harassment, and a reasonable jury could find this conduct to contribute to an objectively hostile environment.

Harrell also alleges a specific instance in which Kershner's conduct crossed the line from being a "mere offensive utterance" to being "humiliating," indicating severity.  *Harris*, 510 U.S. 17, 23 (1993).  "[C]ourts may look to conduct directed at individuals other than the plaintiff in determining whether a hostile work environment exists."  *Nitkin v. Main Line Health*, 67 F.4th 565, 572 n.4 (3d Cir. 2023).  Harrell alleges that Kershner instructed a Hispanic recruiter to sing the song Feliz Navidad during a team meeting and then interrupted the employee's singing to demand that she sing it "with an accent," causing the employee to appear "visibly uncomfortable."[51]  A jury could find that a reasonable person would consider this activity to be "humiliating" and reflective of severe harassment.  *Harris*, 510 U.S. 17, 23 (1993).  Although the conduct was not directed at Harrell, a reasonable jury

---

[50] Taisja Harrell Dep. Tr. 91:20-24, 92:1-7, ECF No. 41-4.
[51] Pl.'s Counterstatement Material Facts, ECF No. 41-2 ¶¶ 67-69.

could find that Harrell's "working conditions were nevertheless altered as a result of witnessing a defendant's hostility towards [another non-Caucasian employee] at the workplace." *Hurley v. Atl. City Police Dep't*, 174 F.3d 95, 110 (3d Cir. 1999).

As another instance of especially serious misconduct, Harrell alleges facts showing that Palakovich explicitly created "an atmosphere of condoned [racial] harassment" at PeopleShare's Green Tree Branch. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1086 (3d Cir. 1996). Palakovich announced to the Green Branch team that he would not contact job candidates with "difficult names" like "Jaqueesha," which a reasonable person would understand to refer to traditionally African American and/or non-Caucasian names.[52] In response, Walker stated that she—like Palakovich—would not call a candidate if their name was hard to pronounce. *Id.* ¶ 31. Viewing inferences in the light most favorable to Harrell, this misconduct created an environment that explicitly encouraged discrimination against non-Caucasian customers. Harrell found this environment to be racially hostile, and a reasonable person could conclude that, again, Harrell's "working conditions

---

[52] Pl.'s Counterstatement Material Facts, ECF No. 41-2 ¶¶ 29-30.

were . . . altered as a result of witnessing" such hostility. *Hurley*, 174 F.3d at 110. This finding is buttressed by Harrell's other allegations of misconduct by Palakovich which, viewed together, further contributed to this atmosphere of condoned racial harassment.

Whether the conduct "unreasonably interferes with an employee's work performance," weighs against Harrell. *Nitkin*, 67 F.4th at 570. There is no evidence showing that any alleged misconduct caused Harrell's work performance to suffer. And Harrell's vague allegations that Kershner and Murray generally treated Harrell with "aggression or a condescending tone" causing Harrell to "not feel comfortable" speaking to Kershner or Murray are not enough. These allegations lack specific facts from which a reasonable jury could find sever or pervasive hostility.

Consider all these factors and "looking at the totality of the circumstances," *Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017), a factfinder could conclude that the identified incidents collectively "rise to a level that could fairly be called severe or pervasive" and thus "'alter[ed] the conditions of [Harrell] employment and create[d] an abusive working environment.'" *Nitkin*, 67 F.4th at 573. Harrell subjectively perceived PeopleShare's work environment to be hostile, and Harrell has shown a

genuine issue of material fact as to whether the environment was objectively hostile. The Court therefore denies summary judgment as to Harrell's hostile work environment claims against PeopleShare.

## B. Claims Against Kershner and Murray

Harrell brings individual liability claims against Defendant Kershner and Defendant Murray under § 1981 and the PHRA. *See* Am. Compl., ECF No. 26 ¶¶ 56-63 (Count II), 64-71 (Count III). The standards for individual liability under the two mechanisms have slight variances, so the Court analyzes them separately. For the reasons below, the Court will deny summary judgment as to each of Harrell's individual liability claims against Kershner and Murray

### a. § 1981 Individual Liability Claims

In contrast to Title VII, individual defendants may be held liable under § 1981 if they are "personally involved" in discrimination against the plaintiff and if they "intentionally caused the [employer] to infringe on [the plaintiff's] Section 1981 rights, or if they authorized, directed, or participated in the alleged discriminatory conduct." *Al-Khazraji v. Saint Francis Coll.*, 784 F.2d 505, 518 (3d Cir. 1986); *see also Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 229 (2d Cir. 2004) ("Personal involvement . . . includes not only direct participation in the alleged violation but also gross negligence in the

supervision of subordinates who committed the wrongful acts and failure to take action upon receiving information that constitutional violations are occurring.").

Harrell has established genuine issues of material fact as to Defendant Kershner's individual liability under § 1981, precluding summary judgment. Kershner was one of Harrell's supervisors, and during Harrell's "ramp up" period Kershner interacted directly with Harrell frequently. *See* Julie Kershner Dep. Tr. 86:10-17, ECF No. 36-11 (indicating that, between Kershner and Murray, the supervisors directly interacted with Harrell at least every other day). *Contra Cardenas v. Massey*, 269 F.3d 251, 268 (3d Cir. 2001) (affirming summary judgment for defendant who had "little contact" with the plaintiff). Much of the "behavior which [Harrell] found offensive was perpetrated by" Kershner, *id.* at 269, including the allegedly physically threatening and humiliating harassment discussed *supra*. Thus, a reasonable jury could conclude that Harrell was personally involved in and participated in the discriminatory actions contributing to the alleged hostile work environment. The Court therefore denies summary judgment as to Harrell's § 1981 individual liability claim against Kershner.

Defendant Murray's individual liability under § 1981 is less clear cut,

but Harrell has succeeded in establishing genuine issues of material fact precluding summary judgment. Like Kershner, Murray was one of Harrell's supervisors, and during Harrell's "ramp up" period Murray interacted directly with Harrell frequently.[53] However, "[t]he majority of the behavior which [Harrell] found offensive was perpetrated by either [Kershner] or [Palakovich]," not Murray. *Cardenas*, 269 F.3d at 269. And unlike Kershner, Harrell's allegations are insufficient to demonstrate that Murray participated in the discriminatory actions contributing to the alleged hostile work environment.

Still, a reasonable jury may be able to find that Murray was personally involved in and participated in PeopleShare's retaliation against Harrell. Two days after Harrell's report to Deedan, Murray met with Kershner and Scott to discuss discharging Harrell.[54] And although there is conflicting testimony concerning who made the decision to terminate Harrell's employment, *see id.* ¶¶ 72-77, both Harrell and Kershner allege that Murray participated in the decision, *see id.* ¶¶ 74-75. Thus, whether Murray was personally involved in and participated in retaliatory conduct is an issue of fact and Harrell has

---

[53] *See* Julie Kershner Dep. Tr. 86:10-17, ECF No. 36-11.
[54] Pl.'s Counterstatement Material Facts, ECF No. 41-2 ¶¶ 71-72.

established a genuine issue of material fact as to Murray's liability.  The Court

therefore denies summary judgment as to Harrell's § 1981 individual liability

claim against Murray.

### b. PHRA Individual Liability Claims

Individual defendants may also be held liable under § 955(e) of the

PHRA, which "forbids 'any person, employer, employment agency, labor

organization or employee, to aid, abet, incite, compel or coerce the doing of

any act'" that is an "unlawful discriminatory practice" under the PHRA.  *Dici*

*v. Commonwealth of Pennsylvania*, 91 F.3d 542, 552 (3d Cir. 1996) (quoting

43 Pa. Cons. Stat. Ann. § 955(e)).  "[A]n individual supervisory employee can

be held liable under an aiding and abetting/accomplice liability theory pursuant

to § 955(e) for his own direct acts of discrimination or for his failure to take

action to prevent further discrimination by an employee under supervision."

*Davis v. Levy, Angstreich, Finney, Baldante, Rubenstein & Coren, P.C.*, 20 F.

Supp. 2d 885, 887 (E.D. Pa. 1998).[55]

---

[55] *See also Frye v. Robinson Alarm Co.*, No. 97–0603, 1998 WL 57519, at *4 (E.D. Pa. Feb. 11, 1998) (explaining that under agency principles a supervisory employee "at times shares the intent and purpose of the employer" and thus "a supervisor's failure to take action to prevent discrimination, even when it is the supervisory employee's own practices at issue, can make him or her liable for aiding and abetting the employer's insufficient remedial measures").

Harrell has established genuine issues of material fact as to Defendant Kershner's individual liability under the PHRA, precluding summary judgment. As one of Harrell's supervisors, Kershner is a proper defendant under § 955(e). *See Dici*, 91 F.3d at 553 ("As Dici's supervisor, Monaco is a proper defendant under § 955(e) and might be liable for aiding and abetting discriminatory practices . . . ."). And, for the reasons discussed *supra*, a reasonable jury could conclude that Kershner engaged in direct acts of discrimination which contributed to the alleged hostile work environment, furthering PeopleShare's discriminatory practices. The Court therefore denies summary judgment as to Harrell's PHRA individual liability claim against Kershner.

Harrell has also established genuine issues of material fact as to Defendant Murray's individual liability under the PHRA, precluding summary judgment. As one of Harrell's supervisors, Murray is a proper defendant under § 955(e). *See Dici*, 91 F.3d at 553. And, as discussed *supra*, a reasonable jury could find that Murray was participated in PeopleShare's retaliation against Harrell, furthering PeopleShare's discriminatory practices. The Court therefore denies summary judgment as to Harrell's PHRA individual liability claim against Murray.

## C. Damages

As to the issue of limiting Plaintiff's claim for damages,[56] the Court will

deny Defendants' motion without prejudice to raise the issue at trial.

## V.    CONCLUSION

For the foregoing reasons, the Court will deny Defendants' motion for

summary judgment.

\_\_\_s/ANITA B. BRODY, J.\_\_\_\_\_
ANITA B. BRODY, J.

---

[56] *See* Defs.' MSJ, ECF No. 36-3, at 40 n.22.